## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOHN WILLIAM THOMPSON and | ) | Case No.  03-62656 |
| KELLI LEANN THOMPSON, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| NICK WIEBERG, | ) | Adversary No.  04-6017 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN WILLIAM THOMPSON and | ) | |
| KELLI LEANN THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

Plaintiff Nick Wieberg filed this adversary proceeding to object to the
dischargeability of a deficiency claim in the amount of $53,888. He contends primarily that
debtors John (Jay) and Kelli Thompson converted cattle in which he held a security interest.
This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has
jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following
constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the
Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of
the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that the
debt is nondischargeable as to both Jay and Kelli Thompson.

## FACTUAL BACKGROUND

Debtors Kelli and Jay Thompson leased pasture land and ran a contract cattle operation beginning in 1994. On January 31, 2000, the Thompsons leased 1500 acres from Bradley and Neva Koon. They also leased 2800 acres from Jerry Highland and 400 acres from Glen Anderson. Wieberg contracted with the Thompsons to care for his cattle beginning sometime in 2000.

On March 7, 2000, the Thompsons borrowed $57,000 from the Farm Service Agency (FSA), and granted FSA a security interest in all crops, all equipment, and all livestock now owned or hereafter acquired. On that same date, FSA filed a UCC-1 financing statement with the Recorder of Deeds and the Office of the Secretary of State. On May 7, 2001, the Thompsons executed two loans with FSA in the amount of $70,000 each. On December 19, 2002, FSA filed an amendment to the UCC-1 in both locations.

On January 17, 2002, the Thompsons purchased 365 head of Wieberg's cattle for a purchase price of $259,150, plus interest. They signed a Cattle Sales Agreement (the Agreement) and a Promissory Note (the Note). According to the terms of the Agreement, the Thompsons gave Wieberg a down payment of $26,000 and promised to pay $67,475 on February 1, 2003, and $197,868 on February 1, 2004. The Agreement also provided that the Thompsons would not sell or relocate either the cattle or the calves without notifying Wieberg. The 365 head of cattle purchased by the Thompsons from Wieberg were designated by a purple and white ear tag. The Thompsons kept these cattle primarily on the

2

Highland Farm. On January 31, 2003, over one year after signing the Agreement, Wieberg filed a UCC-1 with the Missouri Secretary of State.[1]

The Thompsons claim that, despite the language of the Agreement, they had an oral agreement with Wieberg that the February 1, 2003, payment would not be due until March 1, 2003. Wieberg denies such an oral agreement. Nonetheless, the language of the Agreement is controlling, and I find that no oral agreement existed.

On March 7, 2002, the Thompsons formed JK Cattle Ranch, L.P. (JK). Jay Thompson and Charles Reed were the general partners of JK. Reed and Thompson formed JK for the purpose of conducting a cattle feeding, raising and sales business. While the Thompsons never transferred ownership of the cattle to JK, they did use JK's account to pay the expenses of both the contract cattle and their own cattle.

In December of 2002 Wieberg discovered that, without his knowledge, the Thompsons had moved some calves to a feed lot, that JK intended to sell the calves, and that the Thompsons had taken an advance against the sale. Wieberg then contacted the Thompsons, and on January 8, 2003, Wieberg and Jay Thompson together counted the cattle with purple and white ear tags. They counted 322 cattle and 120 calves, and Wieberg documented that number by letter dated January 10, 2003. They both agreed at that time, assuming 10 had cattle died, that 33 cattle were missing.

---

[1]Had Wieberg filed his UCC-1 within 20 days after the purchase, any lien granted to him would have been ahead of the lien in all livestock previously granted to FSA. Mo. Stat. Ann. § 400.9-324(a) (2003).

On March 11, 2003, at Wieberg's insistence, Jay Thompson filed a police report with the Camden County sheriff's department. In the report, Thompson is quoted as saying that he had counted 354 head of cattle at the end of January, which is contrary to Wieberg's January 10 letter, but that when he counted again on March 7, 2003, there were only 322 head. Sometime in March he filed an insurance claim for the 33 missing head, again at Wieberg's insistence, which was denied.

Dexter Holmes, Kelli Thompson's father, assisted the Thompsons in their cattle operation until March of 2003. Both Thompsons testified that Holmes left the second week of March, and that they do not know where he went. They said Holmes informed them, as he was leaving town, that "cattle are missing." Kelli stated that she has had no contact with her father since that time, though their daughter did receive an Easter card from him. She said she did not see the envelope and made no effort to discover either a return address or postmark. Jay Thompson did not include the alleged statement of Dexter Holmes in his police report, and he did not amend the report to include any mention of Dexter Holmes.

The Thompsons did not make the payment to Wieberg in the amount of $67,475 due on February 1, 2003. Instead, on March 7, 2003, Wieberg received a check in the amount of $32,813.04 from the sale of calves at the feed lot, and another check from the Thompsons in the amount of $37,792.89.

In May of 2003 the Thompsons lost their lease on the Highland Farm. Wieberg suggested they sell some of the cattle since he no longer had sufficient pasture land to allow

the cattle to graze. Between May 16 and May 20, 2003, Wieberg rounded up and sold 200 head of cattle with purple and white ear tags. The proceeds of those sales, the sum of $133,687, were used to reduce the Thompsons' obligation to Wieberg from $187,575 to $53,888. Following the sales, by letter dated June 4, 2003, Wieberg sent the Thompsons an accounting in which he stated that 200 cows had been sold, that 33 cows were missing, that 12 cows were dead, and that he still held a lien on 120 cows. He also inquired about insurance compensation for the missing 33 head of cattle. The Thompsons did not respond, or in any way contradict Wieberg's accounting.

Eventually, the Thompsons lost their leases on the Koons Farm and the Anderson Farm. FSA began foreclosure proceedings on all of the equipment and remaining cattle. On October 27, 2004, the Thompsons filed a Chapter 7 bankruptcy petition. FSA filed a motion for relief from stay claiming a lien, in the amount of $183,144.48, on all of the Thompsons' equipment, 120 beef cows, 2 bulls, 17 cull cows, and 99 calves. This Court lifted the stay and permitted FSA to conduct its sale and ordered that the proceeds be escrowed. On December 3, 2003, FSA sold 205 cows for the sum of $91,077.87. Of those 205 head, 71 of them had a purple and white ear tag.

By the time of the foreclosure sale, the Thompsons were missing 131 head of cattle. Kelli Thompson testified that they had owned 490 head of cattle in December of 2002, which would have included Wieberg's cattle with purple and white ear tags, as well as FSA's cattle with orange ear tags. She further testified that they could account for only 359

5

head by December of 2003. She stated that she did not remember losing any cattle in 2001 or 2002. Of the 131 missing cattle, no one could account for the 33 Wieberg cattle, which had been missing in January of 2003, or the additional 49 Wieberg cattle, which were missing at the time of the foreclosure sale.

The parties agreed that FSA held a prior claim to the escrowed funds, therefore, FSA received the sum of $91,077.87 in partial satisfaction of its claim. Wieberg received none of the proceeds and filed this adversary proceeding, claiming that the deficiency debt due him is nondischargeable pursuant to three separate provisions of the Bankruptcy Code (the Code).

On August 25 and 26, 2004, this Court held a hearing. At the hearing, counsel for the Thompsons moved for judgment at the close of Wieberg's evidence or, alternatively, for dismissal for failure to state a claim. This Court overruled that motion. Without objection from Wieberg, I granted the Thompsons' motion to amend their response to conform to the evidence and to allow them to assert, as an affirmative defense, that the Agreement did not create a valid security interest.

<u>DISCUSSION</u>

I.   <u>Count I–11 U.S.C. § 523(a)(2)(A)</u>

Count I of the Complaint contends, pursuant to 11 U.S.C. § 523(a)(2)(A), that the Thompsons affirmatively represented in the Agreement that they would not move, encumber, or liquidate the cattle without Wieberg's permission, that they would maintain

sufficient collateral to pay the obligation, and that these and other representations constituted false pretenses, false representations, or actual fraud.

Section 523(a)(2)(A) excepts from discharge a debt obtained by a false representation:

> a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt–
>
> . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
>
>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.[2]

Wieberg argues that the Thompsons made false representations when, after acknowledging that some cattle were missing in early 2003, they continued to assure him that cattle remained sufficient to satisfy his debt. This section of the Code, however, requires proof of a misrepresentation at the time credit is given, extended, renewed, or refinanced. The only time Wieberg extended credit to the Thompsons was on January 17, 2002. Wieberg offered no evidence that the Thompsons intended to deceive him when they executed the Agreement. In order to successfully challenge the dischargeability of a debt, pursuant to

---

[2]11 U.S.C. § 523(a)(2)(A).

section 523(a)(2)(A), a creditor must prove the following:

(1) the debtor made a false representation;

(2) at the time the representation was made the debtor knew it was false;

(3) the debtor subjectively intended to deceive the creditor at the time he made the

representation;

(4) the creditor justifiably relied upon the representation; and

(5) the creditor was damaged.[3]

Since Wieberg failed to prove that any misrepresentation took place at the time of the

Agreement, he failed to satisfy one of the essential elements of fraud. Any other alleged

misrepresentation did not take place in the furtherance of obtaining credit, thus, it is not

subject to this Code section. I, therefore, find in favor of the Thompsons as to the 11 U.S.C.

§ 523(a)(2)(A) count.

## II.  Count II–11 U.S.C. § 523(a)(4)

Count II contends, pursuant to 11 U.S.C. § 523(a)(4), that the Thompsons' actions

constituted fraud or defalcation while acting in a fiduciary capacity or embezzlement.

Wieberg essentially offered no evidence as to the 523(a)(4) count, so I will address

it only briefly.  Section 523(a)(4) provides for nondischargeability "for fraud or defalcation

---

[3]UCS Universal Card Serv. Corp v. Feld (In re Feld), 203 B.R. 360, 365 (Bankr. E.D. Pa. 1996).

while acting in a fiduciary capacity, embezzlement, or larceny."[4] In Missouri, a plaintiff

must demonstrate the existence of a fiduciary relationship before the statutory crime of

embezzlement can lie.[5] The only evidence before me indicated that the Thompsons and

Wieberg had nothing more than a debtor/creditor–and not a fiduciary-- relationship. I,

therefore, find in favor of the Thompsons as to the section 523(a)(4) Count.

### III.   Count III–11 U.S.C. § 523(a)(6)

Count III contends, pursuant to 11 U.S.C. § 523(a)(6), that the Thompsons disposed

of livestock in which Wieberg held a valid security interest, that such action constitutes

conversion of Wieberg's property, and that such conversion constitutes willful and

malicious injury to his property. The Thompsons asserted, as an affirmative defense, that

Wieberg failed to state a claim for which relief can be granted because he did not have a

valid security interest, thus a property interest, in the cattle he sold to the Thompsons. I,

therefore, begin with that issue.

### A. Security Interest

Article 9 of the Uniform Commercial Code (the UCC) applies to "any transaction,

regardless of its form, that creates a security  interest in personal property or fixtures by

---

[4]11. U.S.C. § 523(a)(4).

[5]*See* Mo. Stat. Ann. §§ 570.010(2) and 570.030.1 (Supp. 2004); *State v. Anderson*, 232 S.W.2d 909, 911 (Mo. 1950); *State v. Reed*, 815 S.W.2d 474, 476 (Mo. Ct. App. 1991); *State v. Grainger*, 721 S.W.ed 237, 239 (Mo. Ct. App. 1986); *State v. David*, 687 S.W.2d 571, 572-73 (Mo. Ct. App. 1984).

contract."[6] A security interest is "an interest in personal property or fixtures which secures

payment or performance of an obligation."[7] The Agreement does not specifically state that

the Thompsons grant Wieberg a security interest in 365 head of cattle. The Agreement does,

however, refer to Wieberg as the "Seller" and the Thompsons as the "Buyers." Pursuant to

the Agreement, possession of the cattle was transferred to the Thompsons, and Wieberg held

the Note from the Thompsons with their promise to pay the sum of $233,000.[8]

The true nature of a secured transaction is often found by looking beyond the words

used in the documents, to the intent of the parties.[9] There is undisputed evidence that the

Thompsons intended to grant Wieberg a security interest in the cattle.  Both Wieberg and

the Thompsons testified to that effect. Wieberg filed a UCC-1, albeit too late, to perfect his

security interest with the Missouri Secretary of State. The Thompsons took  possession of

the cattle, and were totally responsible for their care. And their bankruptcy schedules list

Wieberg as a secured creditor with a purchase money security interest in "purple and white

tag cattle."[10] Wieberg filed a secured claim in the Thompsons' bankruptcy case, in the

---

[6]Mo. Stat. Ann. § 400.9-109(a)(1) (2003).

[7]*Id.* at § 400.1-201(37) (Supp. 2004).

[8]Pl. Ex. # 16.

[9]*Eastern States Life Ins. Co. v. Strauss (In re Crawford)*, 274 B.R. 798, 803 n. 7 (8th Cir. B.A.P. 2002)(citing *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1068- 69 (2d Cir.1995); *Major's Furniture Mart, Inc. v. Castle Credit Corp*., 602 F.2d 538, 543-46 (3d Cir.1979); *United States v. Poling*, 73 F.Supp.2d 882, 893-94 (S.D.Ohio 1999); *In re Paul*, 83 B.R. 709, 713-14 (Bankr.D.N.D.1988)).

[10]Case No. 03-62656, Doc. # 1, Schedule D.

amount of $53,888.[11]

The question before me, however, is whether the Agreement granted a valid security interest in the collateral.[12] A security interest attaches to collateral when it becomes enforceable against the debtor:

> (a) A security interest attaches to collateral when it becomes enforceable against the debtor with respect to collateral, unless an agreement expressly postpones the time of attachment.

> (b) Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if;

>> (1) Value has been given;

>> (2) The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

>> (3) One of the following conditions is met:

>>> (A) The debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned.[13]

There is no dispute that the Agreement satisfies the first two requirements of section 400.9-203(b). Value was given when Wieberg sold the Thompsons 365 heard of cattle, and the Thompsons promised to pay $259,150 over a two-year period. Moreover, the Agreement

---

[11]Proof of Claim # 2 filed November 12, 2003, in Case No. 03-62656.

[12]*Id.* at §§ 400.9-201 and 400.9-203.

[13]*Id.* at § 400.9-203 (a) and (b).

defines the collateral as "approximately 365 head of adult cows."[14] And the Thompsons had rights in the cattle and the power to transfer same, hence the reason for this litigation. The only issue is whether the Thompsons authenticated a security agreement.

There is no magic language to create or provide for a security agreement,[15] but in the Eighth Circuit there must be some language in the agreement itself that can be construed to convey a security interest.[16] In *Shelton v. Erwin*, the parties clearly intended to create a security interest in a vehicle in favor of the seller, however, the only documents memorializing their intent were a bill of sale and a title application. The Eighth Circuit stated that notwithstanding the intent of the parties, "there must be some language in the agreement actually conveying a security interest."[17] In *Federal Deposit Insurance Corporation v. Davis*,[18] however, the Eighth Circuit did look to the intent of the parties in determining that three notes were unsecured despite boilerplate language in the documents themselves regarding security interests.[19] Thus, the intent of the parties only becomes relevant if there is language in the agreement that can be construed as granting a security

---

[14]Pl. Ex. # 15, ¶ 1.

[15]*United States v. Missouri Farmers Associates, Inc.*, 580 F. Supp. 35, 36 (E.D. Mo. 1984), *affirmed*, 764 F.2d 488 (8th Cir. 1985), *cert, denied, Missouri Farmers Association, Inc. v. United States*, 475 U.S. 1053, 106 S. Ct. 1281, 89 L. Ed.2d 588 (1986).

[16]*Shelton v. Erwin*, 472 F.2d 1118, 1119 (8th Cir. 1973).

[17]*Id.* at 1120.

[18]167 F.3d 1199 (8th Cir. 1999).

[19]*Id.* at 1201.

interest.  As other courts have stated, there must be some language in the document that "'leads to the logical conclusion that it was the intention of the parties that a security interest be created."[20] As one treatise states, the essence of a security agreement is to inform "an objective observer that the debtor intended to transfer an interest in personal property as security to a creditor."[21]

I note that both *Shelton* and *Davis* were decided prior to 2001, when Missouri adopted revisions of Articles I and 9 of the UCC. In the official comments to revised Article I, the authors state that the definition of a security interest is substantially the same in the revised version. Whether an agreement creates a security interest, however, under the revised version "depends not on whether the parties intend that the law *characterize* the transaction as a security interest but rather on whether the transaction falls within the definition of 'security interest' in Section 1-201.[22] And Section 1-201 defines a security interest as follows:

> an interest in personal property or fixtures which secures payment or performance of an obligation. The term also includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9. . . . The retention or reservation of title by a seller of goods notwithstanding shipment or

---

[20]*Tilghman Hardware, Inc. v. Larrimore*, 331 Md. 390, 404, 628 A.2d 215, 222 (Md. Ct. App. 1993) (quoting *Mitchell v. Shephard Mall State Bank*, 458 F.2d 700, 703 (10th Cir. 1972)).

[21]James J. White and Robert S. Summers, **4 White & Summers, Uniform Commercial Code** § 31-3 (5th Ed. 2004).

[22]Mo. Stat. Ann. § 400.9-102, Official Comment changes made in 2001 to conform to the 2001 Revision of Article I of the Code.

delivery to the buyer (section 400.2-401) is limited in effect to a reservation of a "security interest."[23]

Within this legal framework, I go to the language in the Agreement. Paragraph nine provides:

> (9) That if any payment is ten days late, all cattle here mentioned, any and all other cattle, personal property, vehicles, farm equipment, hay, real-estate, notes receivable, accounts receivable, owned by "Buyer" or any partnership, corporation, company or like business entity that "Buyer" has ownership in; becomes property of "Seller" until the full debt plus any incurred expenses and interest are paid-in-full; Unless agreed to in writing and signed by "Seller."[24]

Paragraph 13 provides that "this agreement is the only encumbrance that will be placed upon said cattle. (The cattle and their calves may not be used as collateral on any other indebtedness)."[25] These two paragraphs, taken together, lead to the logical conclusion that Wieberg held an interest in the cattle to secure payment of the Thompsons' obligation.

The Thompsons argue that the term "encumbrance" is a term of art defined by the UCC, and applicable only to real estate transactions:

> (32) "Encumbrance " means a right, other than an ownership interest, in real property. The term includes mortgages and other liens on real property.[26]

Wieberg, on the other hand relies on a broader definition of encumbrance:

---

[23]*Id.*  At § 400.1-201(37) (Supp. 2004).

[24]Pl. Ex. # 15, ¶ 9.

[25]*Id.* at ¶ 13.

[26]Mo. Stat. Ann. § 400.9-102(32) (2003).

14

> A claim or liability that is attached to property and that may lessen its value, such as a lien or mortgage; an encumbrance cannot defeat the transfer of possession, but it remains after the property is transferred.[27]

The gravamen of the Thompsons' argument seems to be that the parties could not have intended to create a security interest in the cattle because they used an inappropriate term to indicate that Wieberg held an interest in the cattle. Other courts, however, do not make this semantic distinction. In *Barnard v. Barnard*,[28] the court refers to a docket entry made at the time of a dissolution decree that "indicates that the defendant was awarded real and personal property valued at $51,767, subject to encumbrances in the amount of $38,284."[29] In *Tucker v. Tucker*,[30] the court again discusses a dissolution decree in which "[r]espondent was awarded several items of personal property such as a VCR, microwave, patio furniture and a 1985 Audi automobile valued at $9,750 and subject to a $5,000 encumbrance."[31] In *Pacific American Real Estate Fund, Ltd. v. Kansas City Power & Light Company*,[32] the court found that language in a contract, which stated "FMI shall have acquired good title to all fixtures and personal property located upon, or used in connection with the operation of properties, free and clear of all liens, encumbrances or interests," included a utility

---

[27]**Black's Law Dictionary** 223 (Bryan A. Garner, ed. 1996).

[28]802 S.W.2d 207 (Mo. Ct. App. 1991).

[29]*Id.* at 208.

[30]778 S.W.2d 309 (Mo. Ct. App. 1989).

[31]*Id.* at 311.

[32]633 S.W.2d 285 (Mo. Ct. App. 1982).

deposit.[33] More persuasively, the Missouri legislature uses the term in relation to a state statute that defines the "method of perfecting liens or encumbrances" on motor vehicles.[34] Thus, Missouri law routinely use the term "encumbrances" to refer to security interests in personal property. Since no specific language is necessary to create a security interest, I do not find that inexact language, which still conveys a specific meaning, will defeat the creation.

I find, therefore, that the language in paragraphs nine and thirteen, taken as a whole, leads to the logical conclusion that it was the intention of the parties that a security interest be created."[35] I further find that that obvious intention, coupled with the parties' testimony, and their actions following execution of the Agreement, did provide for and create a valid, enforceable security interest.

I note that Wieberg's failure to perfect his security interest until after FSA had stepped ahead of him is not relevant to this finding. A security interest, which by definition is voluntarily granted, is enforceable between the parties, even if one party to the contract

---

[33]*Id.* at 289.

[34]*See* Mo. Stat. Ann. 301.640(3) ("Sections 301.600 to 301.660 do not apply to or affect: . . . (3) A lien or encumbrance on a motor vehicle or trailer created by a manufacturer or dealer who holds the motor vehicle for sale").

[35]*Tilghman Hardware, Inc. v. Larrimore*, 331 Md. 390, 404, 628 A.2d 215, 222 (Md. Ct. App. 1993) (quoting *Mitchell v. Shephaerd Mall State Bank*, 458 F.2d 700, 703 (10th Cir. 1972)).

fails to perfect that interest as to third parties.[36] There is no question in this case that Wieberg failed to perfect his interest in the cattle before December of 2002, when FSA perfected its lien in its own cattle and all after acquired property. The failure to perfect a security interest, however, neither invalidates the security interest nor alters the rights of the parties to the security agreement. Perfection is purely a device for protecting the rights of third parties, and determining the secured party's priority in relation to third parties.[37]

Having found that Wieberg held a valid, enforceable security interest in 365 head of the Thompsons' cattle, I must determine whether the Thompsons willfully and maliciously converted property subject to that security interest.

## B. Willful and Malicious Injury

Section 523(a)(6) excepts a debt from discharge if the debt arose as a result of a willful and malicious injury to the property of another:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual from any debt–
>
> . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.[38]

---

[36]Mo. Stat. Ann. § 400.9-201(a); *Eastern States Life Ins. Co. v. Strauss (In re Crawford)*, 274 B.R. 798, 806 (8th Cir. B.A.P. 2002); *Tilghman Hardware, Inc. v. Larrimore*, 331 Md. 390, 399, 628 A.2d 215, 218 (Md. Ct. App. 1993).

[37]Mo. Stat. Ann. § 400.9-310 (UCC Comment) (2003).

[38]11 U.S.C. § 523(a)(6).

In determining the scope of this section, the United States Supreme Court addressed what it defined as the pivotal question. "Does section 523(a)(6)'s compass cover acts, done intentionally, that cause injury, . . .or only acts done with the actual intent to cause injury?"[39]  The Court concluded that the word willful modifies the noun injury, indicating that a debt is nondischargeable only if the injury was willful and malicious, not the act.[40] Here, Wieberg contends that the Thompsons converted his collateral with intent to injure him.  In *Barclays American Business Credit, Inc. v. Long (In re Long)*,[41] the Eighth Circuit addressed the issue of conversion in the section 523(a)(6) context.   The Court found that a conversion of property alone is not enough, in itself, to prevent the discharge of a debt.[42] Only when the conversion is "(1) headstrong and knowing ('willful') and, (2) targeted at the creditor ('malicious'), at least in the sense that the conduct is certain or almost certain to cause financial harm" will the resulting debt be nondischargeable.[43] In *Long*, the Court found first that the debtor admitted diverting funds from a collateral account into a corporate account in violation of his contractual arrangement with the creditor. It held that such conduct was unquestionably willful, but the Court accepted Long's explanation that he

---

[39]*Kawaauhau v. Geiger*, 523 U.S. 57, 61 118 S. Ct. 974, 977, 140 L. Ed. 2d 90 (1998).

[40]*Id.*

[41]774 F.2d 875 (1985).

[42]*Id.* at 879 (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332-33, 55 S. Ct. 151, 153, 79 L. Ed. 393 (1934)).

[43]*Id.* at 881.

18

diverted funds in a misguided belief that he could save his company. Thus, the Court found that debtor's actions were not malicious because he did not intend to harm the creditor.[44] In other words, debtors who sell collateral out of trust, and then file for bankruptcy relief, must offer a valid, and credible, explanation for their actions if the resulting debt is to be discharged.

The Thompsons offered no credible explanation at all, but, instead, ask me to believe that 131 cattle–representing more than 25 percent of their herd-- vanished into thin air over a 12 month period. The only attempt at an explanation they offered was that cattle sometimes wander onto a neighbor's farm. But Jay stated that he visited the neighboring farms, and found none of his cattle. Jay also testified that Dexter Holmes left the farm rather mysteriously in March of 2003, and that he has neither seen nor heard from him since. Certainly, by implication, the Thompsons contend that Holmes was responsible for diverting their cattle. Kelli Thompson said their daughter received an Easter card from Holmes shortly after his disappearance, and soon after the Thompsons discovered that 33 head of cattle were missing, but no one checked the envelope for either a return address or a postmark. The Thompsons both insisted that they were too busy to ever count the cattle, even though they knew that cattle were disappearing. Jay Thompson said he had all he could do to feed the diminishing herd, and Kelli said she worked full-time and had no responsibility for the cattle. Nonetheless, she said she kept the books and paid the bills,

---

[44]*Id.* at 882.

including the feed bills, without noticing any reduction in the amount of feed needed. And, while there were 33 head of Wieberg cattle missing when Holmes took off in March of 2003, there were another 49 head of Wieberg cattle missing in December of 2003. In addition, according to Kelli's testimony, they were missing FSA's cattle as well. Yet, the Thompsons made no inquiry of their employees, or of each other, as to the problem, throughout 2003. Their testimony that they have no knowledge of what happened to the missing cattle is simply not credible.

The Thompsons insist that they received no benefit from the missing cattle, and that Wieberg was unable to trace any proceeds from those same cattle. That is not relevant to a section 523(a)(6) claim, however. Wieberg has proven that the Thompsons willfully converted property in which he held a security interest. And the Thompsons have offered no justification for such conversion. I find, therefore, that the Thompsons willfully and maliciously converted  cattle subject to Wieberg's security interest, thereby, causing him injury. As such, the debt resulting from the conversion is nondischargeable.

4. Damages

In Missouri the measure of damages in an action for conversion, and thus the amount which can be excepted from discharge, is the reasonable market value of the property at the time of the conversion.[45] The evidence must be specific to fix the measure of damages, as

---

[45] *See, e.g. Ladeas v. Carter,* 845 S.W.2d 45, 53 (Mo. Ct. App. 1992); *Alexander v. Link's Landing, Inc.,* 814 S.W.2d 614, 617 (Mo. Ct. App. 1991); *Lacks v. R. Rowland & Co., Inc.*, 718 S.W.2d 513, 520 (Mo. Ct. App. 1986); *Breece v. Jett,* 556 S.W.2d 696, 709 (Mo. Ct. App. 1977).

the damages can never be presumed.[46] This Court has, likewise, held that the measure of damages is the value of the chattel converted.[47] An award for damages cannot be based on guesswork or speculation, therefore, I must find that the evidence presented offers a reasonable basis for assessing the damages.

In this case, Wieberg demonstrated that, as of January of 2003, the Thompsons were missing 33 cows with purple and white ear tags. Thereafter, in June of 2003 Wieberg advised the Thompsons by letter that they should have 120 head of his cattle still on hand. The Thompsons did not disagree with this assessment. Yet, by the time FSA took the cattle to market in December of 2003, only 71 cows with purple and white ear tags remained, a loss of an additional 49 head. Thus, I find that 82 cows with purple and white ear tags were converted by the Thompsons.

Both Jay Thompson and Wieberg testified that cattle prices were good during 2003. The best evidence I have of the value of the cattle with purple and white ear tags is the price those cows brought at the sale held on May 16 and May 20, 2003. At that sale the

---

[46]*Alexander v. Link's Landing, Inc.,* 814 S.W.2d at 619 (citations omitted).

[47]*Centerre Bank v. Neosho (In re Major),* 44 B.R. 636, 640 (Bankr. W.D. Mo. 1984); *Mercury Marine Acceptance Corp., v. Wheeler (In re Wheeler)*, 73 B.R. 220, 225 (Bankr. W.D. Mo. 1987) ("Damages, for dischargeability purposes, are limited to the amount for which the converted property is sold"). *Bethany Trust Co. v. Gerken (In re Gerken),* 69 B.R. 251, 254 (Bankr. W.D. Mo. 1986*)* ("An indispensable element of the cause of action is such evidence as would provide the Court with a reasonable basis for assessing damages" because an award of damages cannot be based upon guesswork or speculation). *See also, World Omni Financial Corp. v. Collins (In re Collins)*, 1993 WL 68653 at *3 (Bankr. M.D. Fla.); *Patrick v. Patrick (In re Patrick),* 143 B.R. 200, 203 (Bankr. N.D. Ill. 1992); *Transamerica Commercial Finance Corp. v. James (In re James)*, 124 B.R. 614, 616 (Bankr. S.D. Fla. 1991).

Thompsons sold 200 head of cattle and remitted $133,687.00 to Wieberg. Thus, at the time

of the sale the average price of these cows was $668.44 each. Using that same average

price, I find that the value of the 82 head in which Wieberg held a property interest, and that

were converted by the Thompsons, is $54,812.08. Since that is in excess of the remaining

debt of $53,888, such debt is nondischargeable.

An Order in accordance with this Memorandum Opinion will be entered this date.


/s/ Arthur B. Federman
Bankruptcy Judge


Date: September 22, 2004

COURT TO SERVE PARTIES NOT RECEIVING ELECTRONIC NOTICE